UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

MANDY LOU BROOKS,

                Plaintiff,        Case No.: 11-CV-12486
                                          Honorable Sean F. Cox
          v.                  Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 14]**

Plaintiff Mandy Lou Brooks brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.       RECOMMENDATION**

For the reasons set forth below, the court finds the ALJ's decision that Brooks is not disabled is supported by substantial evidence in the record. Accordingly, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Brooks's motion [9] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On October 26, 2007, Brooks filed applications for DIB and SSI, alleging disability as of February 1, 2003.[1]  (Tr. 96-108).  Her claims were denied initially on January 2, 2008.  (Tr. 52-62).  Thereafter, Brooks filed a timely request for an administrative hearing, which was held on May 7, 2010, before ALJ Tom Walters.  (Tr. 25-51).  Brooks, represented by attorney Karl Bender, testified, as did vocational expert ("VE") Melody Henry.  (*Id.*).  On May 24, 2010, the ALJ found Brooks not disabled.  (Tr. 10-23).  On April 6, 2011, the Appeals Council denied review.  (Tr. 1-6).  Brooks filed for judicial review of the final decision on June 8, 2011 [1].

### B.    Background

#### 1.    *Disability Reports*

In an undated disability report, Brooks reported that she was 5'7" and 197 pounds.  (Tr. 139-47; 139).  She reported that the conditions preventing her from working were:  "Carpal tunnel in both hands and wrists/tendonitis in knee."  (Tr. 140).  She reported that these conditions limit her ability to work because she has pain in her hands, wrists and knees, and numbness in her fingers.  (*Id.*).  She claimed she cannot lift more than one pound without pain and cannot grasp things due to cramping.  (*Id.*).  She also claimed she cannot stand more than one hour before her knees give out and then she has to elevate her knees for an hour before being capable of standing again.  (*Id.*).  Brooks also reported that her knees and ankles swell.  (*Id.*).

Brooks reported that she used to work in various capacities, including as a gas station

---

[1] At the hearing, Brooks's attorney appears to have attempted to amend her alleged onset date to October 12, 2007, based on the quantity of her work history between her original alleged onset date and that date.  (Tr. 29).  However, the ALJ did not use this amended date in his opinion, finding instead that Brooks's work during that period had not risen to the level of substantial gainful employment. (Tr. 15).  Neither party addresses the issue.  Therefore, the court will deem the alleged onset date to be as originally alleged, February 1, 2003.

attendant, a house, office and hotel cleaner, and at a bakery.  (Tr. 141).  She lost at least one job due to her condition.  (Tr. 140).  She listed a number of doctors that she sees for treatment of conditions, and the only medication she listed was Aleve.  (Tr. 143-45).

In an undated disability appeals report, Brooks reported that her condition had worsened as her pain and numbness in her wrists and fingers had increased.  (Tr. 148-54; 149).  She now required both hands to lift objects and must avoid stairs due to her knee pain.  (Tr. 149).  She could no longer fasten buttons or bras, and could not zip zippers or tie shoes.  (Tr. 152).  In addition to the Aleve, she was now taking Motrin 800.  (Tr. 151).

### 2.    *Plaintiff's Testimony*

At the hearing, Brooks testified that she lost a job as a housekeeper because she could not finish her jobs in time due to loss of function in her hands.  (Tr. 36).  Her most serious problems, in order of severity, were her hands, her back and her knees.  (Tr. 37).  Brooks had carpal tunnel surgery about six or seven years prior, but testified that it did not completely relieve her pain. She still has a difficult time picking up small objects and writing.  (Tr. 37-38).  Her pain is mostly located on her left hand in her index finger to her thumb, with numbness in her pinky and, on her right hand, from her index finger to her thumb.  (Tr. 38).  Those areas of her hands cramp up when she uses them.  (Tr. 38-39).  Brooks testified that writing, eating with utensils and washing silverware bother her hands the most.  (Tr. 39).  She testified that she uses Ace bandages for her hands.  (Tr. 40).  She testified that she can lift about five pounds or a gallon of milk if she uses both hands, but cannot carry it very far.  (*Id.*).

Brooks testified that she has pain in her back near her kidneys that radiates down her legs.  (*Id.*).  The severity of the pain depends on the length of time she remains in any one position and the type of chair in which she is sitting.  (Tr. 41).  She testified that she can stand for

about 10-15 minutes.  (*Id.*).  Walking does not bother her back, although it bothers her knees and she can only walk about a half a block at a time.  (Tr. 42; 45).  Brooks testified that she relieves her pain by sitting in her reclining chair and using a heating pad.  (Tr. 42).  She sits in her chair approximately three or four times a day for an hour to an hour-and-a-half at a time.  (Tr. 43).  She used to take Aleve, but after learning that one of the possible side effects was kidney damage, she stopped taking it.  (Tr. 42).  She now takes nothing for the pain.  (*Id.*).

Brooks testified that her knees hurt when she had to be on them for an extended period of time, as when she was cleaning floors.  (Tr. 37; 43).  Her knees creak when she bends and straightens them, and they swell when she is "on them too much, or do[es] any kneeling."  (Tr. 43).  Climbing stairs is very painful.  (Tr. 44).  Sitting in her recliner relieves the pain and swelling.  (*Id.*).

Brooks testified she can no longer perform her previous jobs because of the pain in her hands, knees and back.  (Tr. 44-45).  She testified that she also cannot engage in her former hobbies, like playing cards or bowling, for the same reason.  (Tr. 45).  She drives only when necessary and splits the household chores with her husband.  (Tr. 45-46).  She also shops with her husband, but does not do any heavy shopping.  (Tr. 46).

> 3.    *Medical Evidence*
>
> a.    *Treating Sources*

For ease of discussion, the court will categorize Brooks's medical records by condition.

> i.    Carpal Tunnel Syndrome and Arm Pain

On March 12, 2003, an EMG was conducted on Brooks's upper extremities, revealing mild right carpal tunnel syndrome ("CTS") and borderline left CTS.  (Tr. 220-22).  At an appointment with Dr. R. Charles Medlar on March 27, 2003, Brooks reported pain and numbness

in both hands, which she attributed to her employment duties. (Tr. 206). She reported that the pain woke her up at night and her hand would go numb when she was on the phone. (*Id.*). Upon examination, Brooks had positive Tinel's sign in both hands, though more in the right than the left. (*Id.*). Her muscle strength and bulk were good. (*Id.*). There was diminished sensation in her thumb, index and middle finger, but she had good radial and ulnar pulses. (*Id.*). Brooks had a full range of motion in her wrists, elbows, shoulders and neck. (*Id.*). The doctor recommended surgery on her CTS bilaterally, and the first was scheduled for April 9, 2003. (*Id.*).

At a post-surgical appointment with Dr. Medlar on December 18, 2003, Brooks reported pain in both hands, radiating into her forearm. (Tr. 205). She reported stiff and sore fingers, numbness in both hands, and that her left pinky finger went cold. (*Id.*). She classified the pain as 7 out of 10 at rest and 10 upon activity. (*Id.*). She reported that the Motrin 800 she was taking was not helping, nor were the braces prescribed. (*Id.*). Upon examination, Dr. Medlar noted no swelling in Brooks's hands, wrists or fingers, and well-healed incisions. (*Id.*). He found that light touch and pinprick tests were inconsistent with determination of a pattern. (*Id.*). Dr. Medlar concluded that Brooks "has a lot of symptoms that I cannot account for based on anatomic findings." (*Id.*). He believed she might have some inflammatory problem and recommended rheumatoid testing. (*Id.*). Rheumatoid testing on the same date revealed a rheumatoid factor of 5 out of 14 and a negative result for anti-nuclear antibodies. (Tr. 219). An EMG conducted on January 19, 2004, yielded normal results, as did an EMG conducted on March 19, 2004. (Tr. 202-204; 215-17).

Brooks did not see a doctor again about her CTS or other arm pain until May 2005. At an appointment with Nurse Practitioner Amy Anglin on May 20, 2005, Brooks reported that she had tripped and fallen, landing on her left arm, causing pain in her wrist, elbow and shoulder. She

reported no difficulties with movement, except pain upon movement.  (Tr. 195).  Brooks reported Aleve had helped and that she had not iced the injury much.  (*Id.*).  She reported no real numbness or tingling.  (*Id.*).  Upon examination, Anglin found Brooks's grip strength equal bilaterally, radial pulses intact, but a possible minute amount of swelling in her left hand.  (*Id.*).  Brooks's capillary refill was brisk, slight tenderness upon palpation of the lateral epicondyles and pain upon palpation of the shoulder, but none at the wrist.  (*Id.*).  Brooks retained full range of motion in her shoulder.  (*Id.*).  Anglin prescribed Brooks Motrin 800 for the pain and ordered x-rays of her left wrist, elbow and shoulder.  (*Id.*).  The x-rays revealed generally normal findings, except there was an ulnar minus variance in Brooks's left wrist.  (Tr. 193-94).

At a follow-up appointment with Dr. Rosemarie Tolson, Brooks reported no change in the condition of her left arm, despite the Motrin 800.  (Tr. 192).  She reported that most of the pain was in her elbow.  (*Id.*).  Upon examination Dr. Tolson found some tenderness on the lateral epicondyle and some of the extensor tendons there.  (*Id.*).  She noted increased pain in that area with resisted finger extension and resisted wrist extension.  (*Id.*).  There was some shoulder discomfort with abduction above shoulder height.  (*Id.*).  There was no AC joint tenderness.  (*Id.*).  Brooks's wrists had a full range of motion without discomfort.  (*Id.*).  Dr. Tolson gave Brooks an injection in the lateral epicondyle, which resulted in immediate relief.  (*Id.*).  She also gave Brooks a prescription for Naprosyn.  (*Id.*).

At an appointment with Dr. Tolson on June 21, 2005, Brooks reported that her elbow pain had much improved since her injection, but that now she was suffering from bilateral wrist pain that radiated up her arms.  (Tr. 191).  She reported that the use of Motrin 800 was helping slightly, but that the pain was generally 6 out of 10 in severity, and worse with activity.  (*Id.*).  She also reported numbness that came and went, affecting all fingers and her hands.  (*Id.*).  Upon

examination, Dr. Tolson noted a positive Phalen's sign and a positive Tinel's sign.  (*Id.*).  She

ordered an EMG and nerve conduction study of Brooks's upper extremities.  (*Id.*).

A neurological exam was conducted by Dr. Daniel Freeman, a neurologist.  (Tr. 189-90).

He found a negative Tinel's sign at both wrists, no atrophy or weakness and normal strength and

reflexes bilaterally.  (*Id.*).  The EMG and nerve conduction studies were both normal bilaterally,

with no evidence of right or left median neuropathy (CTS) at the wrist.  (*Id.*).

At an appointment with Dr. Tolson on July 20, 2005, Brooks again complained of pain in

both wrists that, on the left side, radiated up into her arm and occasionally into her chest.  (Tr.

186).  She reported that her grip was weak, especially on her left side, and she had numbness in

her fourth and fifth fingers.  (*Id.*).  Upon examination, Dr. Tolson could only find pain at the AC

joint.  (*Id.*).  She found that Brooks's numbness in her fingers occurred at "unusual times," but

her fingers did lose color at certain points as well.  (*Id.*).  Dr. Tolson concluded that, despite the

recent normal EMG, Brooks might still have some nerve compression.  (*Id.*).  She prescribed

Ultram for the pain, a Medtrol-Dosepack for inflammation, ordered a chest x-ray, and referred

Brooks to an orthopedic specialist.  She recommended that Brooks return after seeing the

orthopedist.  (*Id.*).  There is no evidence in the record that Brooks saw an orthopedist, however.

Brooks did not see a doctor again about her hand pain until October 29, 2007.  (Tr. 175).

On that date, at an appointment with Dr. Rose Johnson, Brooks reported pain in both hands and

numbness in her little finger.  (*Id.*).  She also reported pain between her thumb and index finger,

making it difficult to hold onto things.  (*Id.*).  Upon examination, Dr. Johnson noted that Brooks

could make a fist, but it was strained.  (*Id.*).  Her sensation appeared to be intact, and a Tinel's

sign exam revealed that Brooks felt "a little uncomfortable but nothing very specific."  (*Id.*).  Dr.

Johnson ordered an EMG, nerve study and x-ray.  (*Id.*).  X-rays taken on November 5, 2007,

7

revealed an unchanged mild ulnar variance in Brooks's left wrist, and a mild ulnar minus variance in her right wrist. (Tr. 169-70). They also revealed small subchondral cystic change in her distal left scaphoid with no other abnormalities in her left hand. (*Id.*). In her right hand, x-rays revealed minimal degenerative changes in her right thumb. (*Id.*). An EMG and nerve conduction study on October 30, 2007, conducted on her right hand only, were both normal. (Tr. 171-74). At an appointment with Dr. Johnson on November 13, 2007, Brooks reported that her EMG had been of her right hand only, and Dr. Johnson ordered a left upper extremity EMG and nerve conduction study. (Tr. 166). There is no record of that EMG in the file.

At a February 3, 2009 appointment with Dr. Johnson, Brooks reported having bilateral hand pain for one month. (Tr. 240-41). She reported pain in her right thumb and the knuckles of her left hand. (*Id.*). She refused pain medication and instead wanted a short brace. (*Id.*). Upon examination, Dr. Johnson found no joint deformity, heat, swelling, erythema or effusion, and that Brooks had a full range of motion. (*Id.*). She gave Brooks Ace bandages. (*Id.*).

At an appointment on December 8, 2009, Brooks reported pain in her hands and some numbness in her fingers. (Tr. 237). She reported that she had to do all the work at home as her husband could not due to pain in his leg and the fact that he was recovering from surgery. (*Id.*). Upon examination, Dr. Johnson noted that Brooks could make a fist with both hands, and the movement of her wrists was intact bilaterally. (*Id.*). She could also hold both wrists in flexation without pain. (*Id.*). Upon Brooks's request, Dr. Johnson prescribed Ultram for the pain. (*Id.*).

At an April 15, 2010 appointment, Brooks complained of pain in both hands, especially in her index fingers and thumbs, as well as her wrists. (Tr. 233-34). Upon examination, Dr. Johnson noted that Brooks could not make a complete fist with both hands and could not touch her little fingers with her thumbs. (Tr. 234). Brooks's wrist movements were intact, though she

8

experienced pain in her hands and wrists upon flexation.  (*Id.*).  Dr. Johnson ordered x-rays and continued her medications.  (*Id.*).  X-rays taken on April 21, 2010, revealed mild degenerative changes involving her thumb joint in both hands as well as mild negative ulnar variances in both hands.  (Tr. 245).  An EMG conducted that same date returned normal findings.  (Tr. 244).

At an appointment with Dr. Johnson on May 4, 2010, Brooks complained of bilateral hand pain, including pain in her index finger and thumb, radiating up her right arm and making it difficult to grasp things.  (Tr. 257-59).  Upon examination, Dr. Johnson noted that Brooks had difficulty making a fist due to pain mainly along her right thumb and index finger.  (Tr. 258).  She diagnosed arthritis in the thumb and continued Brooks's medications.  (*Id.*).

ii.    Back Pain

At an appointment with Dr. Johnson on August 18, 2009, Brooks complained of lower back pain with no radiation to her extremities, that was aggravated by bending.  (Tr. 238).  Upon examination, Dr. Johnson noted tenderness in Brooks's lumbar spine, but with normal flexation. (*Id.*).  She also noted that Brooks was able to squat and stand on one foot at a time.  (*Id.*).  She diagnosed Brooks with lumbago (lower back pain) and ordered an x-ray.  (*Id.*).  An x-ray taken of Brooks's lower back on that same day revealed mild hypertrophic degenerative disc disease at L2-L3 and at L3-L4, and minimal facet arthritis at L5-S1.  (Tr. 247-48).

At an appointment with Dr. Johnson on May 4, 2010, Brooks complained of cervical and lumbar back pain that did not radiate.  (Tr. 257-59).  Upon examination, Dr. Johnson found tenderness in Brooks's cervical and lumbar spine, with no paravertebral spasm.  (Tr. 258).  She noted normal lateral flexation.  In addition, straight leg raising tests were negative.  (*Id.*).  In addition to the previous diagnosis of lumbago, she diagnosed Brooks with cervicalgia.  (*Id.*).  Dr. Johnson ordered x-rays and continued Brooks's pain medication.  (*Id.*).

9

X-rays taken of Brooks's lumbar spine on May 5, 2010, found the condition of her lower back unchanged from her previous x-rays.  (Tr. 260).  X-rays taken of Brooks's cervical spine revealed advanced cervical spine disc, facet, and uncovertebral joint degenerative changes.  (Tr. 261).  There was a loss of cervical lordois, as well as mild C4-C5, moderate to severe C5-C6 reduction, and moderate C6-C7 reduction.  (*Id.*).  Osteophytes were present at these levels as well.  (*Id.*).  Uncovertebral joint degeneration was observed at right and left C4-C5, C5-C6, and C6-C7.  (*Id.*).  There was also facet degeneration at left C3-C4 and C4-C5.  (*Id.*).

### iii.   Knee Pain

X-rays taken on March 28, 2003, revealed minimal joint space narrowing medially in both knees, suggesting minimal degenerative joint disease.  (Tr. 165).  Seven years later, at an appointment with Dr. Johnson on April 15, 2010, Brooks complained of pain in both knees in the morning and with bending.  (Tr. 233-34).  She also reported popping in her knees.  (Tr. 233).  Upon examination, Dr. Johnson noted bilateral knee crepitus and mildly reduced range of motion of Brooks's right knee and mild pain with motion of her left.  (Tr. 234).  She ordered x-rays.  (*Id.*).  X-rays taken on April 21, 2010, revealed mild degenerative changes involving Brooks's patellofemoral joint bilaterally, with subchondral stenosis and mild spurring.  (Tr. 246).

### b.   *Consultative and Non-Examining Sources*

An RFC assessment was made by medical consultant Christine Brennan on January 2, 2008.  (Tr. 224-31).  Based on an examination of the records to date, she found Brooks capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and/or walking about six hours of an eight-hour day, and sitting for the same amount of time.  (Tr. 225).  She found unlimited Brooks's ability to push or pull.  (*Id.*).  She found no postural, manipulative, visual or communication limitations.  (Tr. 226-28).  She did limit Brooks's exposure to vibration to less

10

than moderate.  (Tr. 228).

### 4.    *Vocational Expert's Testimony*

VE Melody Henry testified that Brooks's prior jobs had all been medium exertion and unskilled.  (Tr. 48).  The ALJ asked the VE to assume a person of the same age, education and vocational experience as Brooks, who had an RFC "for a range of light unskilled work. However, that range would be further restricted by a requirement of no prolonged walking beyond 100 yards, and no – or only occasional bending, twisting and turning.  No climbing, crawling, squatting or kneeling.  No use of air or vibrating tools."  (*Id.*).  He then asked the VE whether there were jobs that such a hypothetical claimant could perform.  (*Id.*).  The VE testified that such a claimant could perform the occupations of hand packer (6,000 jobs in the state economy), production inspector (3,000 jobs) or office machine operator (1,300 jobs).  (*Id.*).

The ALJ then modified the hypothetical to include a restriction of only occasional pushing, pulling, gripping or grasping.  (Tr. 49).  The VE testified that this would eliminate the hand packer and production inspector positions, but the office machine operator position would remain at the numbers cited.  (*Id.*).  In addition, other jobs would satisfy these criteria, including counter clerk (2,100 jobs) and a reduced range of record clerk position (1,070 jobs).  (*Id.*).

The ALJ then modified the hypothetical again, asking the VE whether or not those jobs would be available if he found credible all of Brooks's testimony.  (*Id.*).  The VE said no, primarily because Brooks's need to lie down with her legs elevated three to four times a day for an hour to an hour-and-a-half would preclude her from all competitive employment.  (*Id.*).

Counsel asked the VE what jobs would be available if Brooks's testimony was credited regarding the weight she could lift.  (Tr. 50).  The VE testified that this would eliminate the office machine operator position, but not the record clerk or counter clerk positions.  (*Id.*).

Counsel then posited whether those other positions would be eliminated because of Brooks's need to recline three to four times a day, and the VE answered in the affirmative.  (*Id.*).

At the conclusion of the hearing, the ALJ agreed to hold the record open for the submission of additional evidence by Brooks, and specifically x-rays that had only recently been taken and were not yet available.  (*Id.*).

### C.        Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if

other work exists in the national economy that plaintiff can perform, in view of
his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21
(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of
Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout
the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is
not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human
Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

> **D.     The ALJ's Findings**

Using the five-step sequential analysis, the ALJ concluded that Brooks was not disabled.
(Tr. 13-21). At Step One he determined that although she had worked after her alleged onset
date, that work approached but did not rise to the level of substantial gainful activity. (Tr. 15).
At Step Two he found the following conditions to be severe: "history of carpal tunnel syndrome,
post surgical release; degenerative changes of the lumbar and cervical spine; mild degenerative
changes, bilateral knees; mild degenerative changes of the thumbs; obesity." (Tr. 15-16). At
Step Three, the ALJ determined that Brooks's impairments, or combination of impairments did
not meet or medically equal a listed impairment. (Tr. 18). He then assessed Brooks's RFC,
finding her capable of performing

> light work . . . with the following: she can lift and carry 20 pounds
> occasionally and 10 pounds frequently; she can sit 6 hours in an 8-hour
> workday; she can stand and/or walk 6 hours in an 8-hour workday
> however, she cannot walk beyond 100 yards; she can occasionally bend,
> twist or turn; she cannot climb, crawl, squat, knee[l], or use air/vibrating
> tools; she can occasionally push, pull, grip or grasp.

(Tr. 18). At Step Four he found that she could not return to her past relevant work which was of
medium exertion. (Tr. 20). At Step Five, based on the testimony of the VE, the ALJ concluded

that there were a significant number of jobs that Brooks could perform, given her age, education, vocational experience and RFC.  (*Id.*).  Thus, she was not disabled.  (Tr. 21).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

## F.      Analysis

Brooks argues that the ALJ failed to fully develop the record given that there were no treatment records in the file containing any work restrictions based on her conditions.  She also argues that the ALJ applied the wrong standard in assessing disability, requiring Brooks to submit treating records that prove Brooks had been issued a "work preclusive limitation" or opining that she was "totally disabled" in order to qualify for disability under the Act, when the actual standard is less exacting.  Finally, Brooks argues that there was not substantial evidence in the record to support the ALJ's RFC assessment.  The court takes each argument in turn.

### 1.      Development of the Record

Brooks first argues that the ALJ failed to adequately develop the record.  In support she cites a portion of the ALJ's opinion where he states, "Specifically, no physician imposed a work preclusive limitation on the claimant's functioning, or opined that [s]he was totally disabled or

more limited than the residual functional capacity adopted." (Tr. 19). She construes the ALJ's finding as an indicator that he needed to recontact her treating physicians to determine what, if any, restrictions they would have place upon her. She also argues that that the ALJ impermissibly relied exclusively on the RFC assessment of a non-medical expert who did not examine Brooks nor have all of her medical records at the time of the assessment. The court disagrees with these arguments.

The court rejects Brooks's characterization of the ALJ's decision. The ALJ was not saying or assuming that evidence of doctor-imposed work-preclusive limitations existed. Nor was he conveying a supposed inability to ascertain the level of Brooks's limitations based on the record before him. Rather, he was merely noting that the record, which was Brooks's obligation to provide, did not contain work-preclusive limitations.

As a general matter, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.3d 211, 214 (6th. Cir. 1986). However, "under special circumstances – when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures -- an ALJ has a special, heightened duty to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) *citing Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983); *see also Rowe v. R.R. Ret. Bd.*, 114 Fed. Appx. 189, 193 (6th Cir. 2004) *citing Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986) ("the hearing officer is under no heightened duty to develop the record when a claimant is represented by counsel.")

Here, not only was Brooks represented by counsel at the hearing, but counsel requested,

16

and received, an extension of time to supplement the record after the hearing closed. *Wilson v. Astrue*, No. 10-286, 2011 U.S. Dist. LEXIS 112009 at *20-21 (E.D. Ky. Sept. 29, 2011) (ALJ did not have heightened duty where claimant actively participated in hearing and was represented by counsel). Furthermore, regulation 20 C.F.R. § 404.1527(c)(3) requires an ALJ to recontact a treating physician only when he or she cannot ascertain the basis of the physician's opinion from the record. However, "[u]nder this regulation, absent a finding of inconclusive or 'insufficient evidence to decide whether [a claimant is] disabled' an ALJ is not required to recontact a treating physician." *McNelis v. Comm'r of Soc. Sec.*, No. 08-12529, 2009 U.S. Dist. LEXIS 89792 at *26 (E.D. Mich. Sept. 29, 2009) quoting 20 C.F.R. § 404.1527(c)(3). Here, the ALJ cited to numerous pieces of evidence in the record that supported his conclusion that Brooks was not disabled. (Tr. 19). For instance, the ALJ noted:

> Imaging studies of the claimant's spine were negative for malalignment, neurogenic insult, stenosis, or profound erosive changes. Films of the claimant's knees, wrists and hands showed modest anomalies. Most recent electromyography reviews showed no carpal tunnel, neuropathy, radicular process or other electrodiagnostic distortion…and some clinicians noted that her complaints appeared somewhat out of proportion to objective findings…it was reported that claimant performed self care tasks, washed dishes, completed a variety of household chores, drove short distances, went shopping and spent time with family.

(*Id*). Having reviewed and considered numerous medical records spanning seven years, the ALJ's decision is hardly the product of an insufficient evidentiary record. To the contrary, his decision is supported by substantial evidence.

Finally, as the Commissioner points out, the ALJ did not rely on the medical consultant's RFC assessment. Rather, he specifically noted that because certain of the relevant records were not available to the consultant, the ALJ was adopting "a somewhat more restrictive residual functional capacity" than the consultant had proposed. (Tr. 19). As the RFC is an assessment of

17

the most a claimant can do, despite his or her limitations, its formulation is the ALJ's responsibility alone. 20 C.F.R. § 404.1545.  Accordingly, the ALJ is not bound by any specific medical opinion, and should base a claimant's RFC on "all of the relevant medical and other evidence." *Id.*; *see also Paul v. Astrue*, 827 F. Supp. 2d 739, 745 (E.D. Ky. 2011).  The ALJ did so here, and did not err in not recontacting Brooks's treating physicians.

> 2.     *Standard for Disability*

Brooks next argues that the ALJ applied the wrong standard when assessing whether or not she was disabled under the Act.  She again relies on the ALJ's statement that "no physician imposed a work preclusive limitation on the claimant's functioning, or opined that [s]he was totally disabled or more limited than the residual functional capacity adopted.  The undersigned notes the results of radiographic, EMG, CT, [ ] and clinical evaluations which did not unveil totally disabling pathology."  (Tr. 19).  Brooks interprets this passage as the ALJ applying a higher standard of proof for disability than that required by the Act.  Specifically, she characterizes the ALJ's statement as ***requiring*** her to prove she is "totally disabled" or that "she is completely unable to work," [9 at 13], when the Act defines "disability" more liberally.  *See supra*, p. 12; 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Brooks's argument lacks merit.  First, the ALJ's statements were true.  The record did not contain any opinions from Brooks's treating physicians limiting her ability to work.  Second, her argument ignores the portion of the passage where the ALJ states that none of Brooks's treating physicians opined that she was totally disabled "***or more limited than the residual functional capacity adopted***."  Finally, and most importantly, although the ALJ perhaps could have more carefully chosen a word or two, overall his decision makes clear that he was not holding Brooks to a "totally disabled/completely unable to work" standard, and that he applied the proper

18

standard.  The ALJ found Brooks not disabled under the Act not because she was not "totally disabled," but because he concluded, based on his RFC assessment and the VE's testimony, that she was capable of performing a limited range of light work, where a significant number of those types of jobs were available in the state economy.  (Tr. 20-21).  Thus, the court finds that the ALJ applied the correct standard here.  *See supra*, pp. 12-13.

### 3.     Substantial Evidence

Finally, Brooks argues that there is not substantial evidence in the record to support the ALJ's RFC assessment.  She cites her own testimony that she needed to recline three to four times a day for an hour to an hour-and-a-half each time, in order to relieve her back pain and knee pain and swelling.  However, as the ALJ documented fully in his decision, the medical evidence of Brooks's knee and back pain (specifically her lower back pain, which was the only back pain she mentioned in her testimony), showed only minimal or mild degenerative changes.  (Tr. 16-19).  The status of her lower back had not changed in the year separating her x-rays, and at the time of the hearing she took no medication for it.  (Tr. 16-17; 19).  Similarly, x-rays taken of Brooks's knees in 2003 revealed minimal degenerative changes.  (Tr. 16).  There had been no reports or tests between 2003 and 2010.  (Tr. 16-17).  There is no evidence Brooks even complained to her physicians about her knees during that period.  For these reasons, the court finds that the ALJ did not err in finding Brooks's testimony on this subject not entirely credible and in not including a limitation in his RFC assessment to account for her alleged need to recline with her feet elevated for three or more hours a day.

In sum, the court finds that substantial evidence supports the ALJ's conclusion that Brooks is not disabled under the Act.

## III.     CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Brooks's Motion for Summary Judgment **[9]** be **DENIED**, the Commissioner's Motion **[14]** be **GRANTED** and this case be **AFFIRMED**.

Dated: July 5, 2012                                    s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                                United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 5, 2012.

                                                            s/Felicia M. Moses
                                                            FELICIA M. MOSES
                                                            Case Manager

20